**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| L.H., Jr.,<br><br>  Plaintiff,<br><br>  v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>  Defendant. | Case No.: 1:12-cv-00022 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF L.H., JR. |

L.H., Jr., ("Plaintiff") by and through his guardian ad litem Felisha Owens, asserts he is entitled to benefits under the Social Security Act. Plaintiff argues the administrative law judge ("ALJ") erred in assessing his functioning in one of the six domains used to evaluate the abilities of a minor. Therefore, Plaintiff seeks judicial review of the ALJ's administrative decision. For the reasons set forth below, the ALJ's decision is **AFFIRMED**.

**PROCEDURAL HISTORY**

On October 31, 2008, Plaintiff filed an application for Title XVI benefits, alleging disability beginning January 1, 2007. (Doc. 15-6 at 3). The Social Security Administration denied the claim initially and upon reconsideration. (Doc. 15-5 at 2-13). After requesting a hearing, Plaintiff testified before an ALJ at a hearing held January 25, 2011. (Doc. 15-3 at 25). The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on July 30, 2010. *Id.* at 6-20. Plaintiff requested a review by the Appeals Council of Social Security, which found no

reason to change the ALJ's decision on November 3, 2011.  *Id.* at 2.  Thus, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, a minor claimant must demonstrate he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential three-step process for evaluating a minor claimant's alleged disability.  20 C.F.R. § 416.924(e).  The process requires the ALJ to determine whether the child (1) engaged in substantial gainful activity and (2) has a severe

impairments or combination of impairments (3) that met or equal one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.*

The ALJ must evaluate how the child's limitations affect six broad areas of functioning called "domains" to determine whether a child's impairments functionally equal a Listing. *See* 20 C.F.R. § 416.926a. The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). When "marked" limitations exist in two domains of functioning, or an "extreme" limitation exists in one domain, the minor claimant meets the Listing requirements. 20 C.F.R. § 416.926a(a).

**A.   School records**

Plaintiff was disciplined at Roosevelt Elementary for disobedience to a teacher and the principal. (Doc. 15-8 at 53). In addition, he was disciplined at Frank West Elementary for violence and engaging in "habitual profanity or vulgarity." *Id.* at 49-52. In one incident, Plaintiff was suspended on January 19, 2005, after "he pushed and hit another student" over a tetherball game during recess. *Id.* at 52. Later the same month, Plaintiff was suspended for three days after he "punched another student 3 times while in line for lunch." *Id.* On March 30, 2006, Plaintiff was suspended because "he showed a student a pocket knife and told that student that if this other boy messes with him he was going to use it." *Id.* at 49. However, expulsion was not recommended. *Id.*

Plaintiff continued to exhibit disruptive behavior after moving to McKinley Elementary school. On December 7, 2006, Plaintiff was reprimanded for "[d]isrespect to other students." (Doc. 15-8 at 48). The teacher noted Plaintiff was: "Loud and disruptive in class. Blurting out constantly. Not keeping hands to himself. Girls are complaining that hie [sic] hits and bullies them. Using bad language." *Id.* Likewise, on December 11, Plaintiff "was singing loudly throughout the room," although he "had more than 5 warnings." *Id.* On December 20, Plaintiff was suspended for a single day for "repeatedly disrupt[ing] classroom instruction by talking out of turn, arguing with others, and threatening others." *Id.*

As a fifth grader, Plaintiff was reprimanded or suspended on several occasions for his behavior toward other students, including "[c]ussing out another student," kicking a student, "intimidating

another student after having been told to stay away from him," and hitting a girl on the arm at recess. (Doc. 15-8 at 41-47). Plaintiff also threatened other students, and in the presence of the vice principal told students: "I'm going to pop both you niggers today. There, I don't give a fuck." *Id.* at 38. Further, he was punished for defiance and "[d]isrespect to an adult." *See, e.g., id.* at 39-41. For example, after he received two referrals the afternoon of January 16, 2008, Plaintiff "refused to come to the office with his teacher," and "[w]hen he eventually came he stormed through and shouted, 'Skip you Ms. [redacted], you're a dumb teacher anyway!'" *Id.* at 40. Expulsion was recommended on August 6, 2008, although he continued to attend the school. *Id.* at 36.

A team from McKinley Elementary (including the vice principal of his school, the school nurse, a counselor, and academic program leader) completed an assessment for an accommodation review request on September 12, 2008. (Doc. 15-9 at 16). The team noted the area of concern for Plaintiff was "social function," noting he "lacks self control when angry" and was suspended for threats, hitting, and extortion. *Id.* at 18. The staff opined Plaintiff was articulate and "demonstrated leadership skills." *Id.* In conjunction with the assessment, Plaintiff's mother reported he "can be lovable and has a good sense of humor." *Id.*

On October 15, 2008, the school team provided an updated assessment, and opined Plaintiff's conduct was not caused by disability. (Doc. 15-10 at 84).The team explained: "[L.H] chooses the behavior that gets him attention and gives him a sense of control. He has shown that he can follow the rules when he chooses." *Id.* In the Behavior Support Plan, the team noted: "[L.H.] has great leadership abilities, is intelligent, very independent. . . [L.H.] is very articulate and has strong communication skills." *Id.* at 85. The team reiterated that Plaintiff "engage[d] in disruptive behavior and physical aggression to seek attention and demonstrate control and power." *Id.*

On December 5, 2008, expulsion was recommended from the Bakersfield City School District. (Doc. 15-8 at 32; Doc. 15-9 at 58). The notice to Plaintiff's mother explained:

> School personnel have recommended an expulsion based on the following: On 11/04/08 [L.H.] accused another student of touching his butt. [L.H.] called the other student gay and threatened him that he was going to beat him up. After speaking with the Campus Supervisor and Principal, [L.H.] became very angry and violent in the office. The authorities were called to take [L.H.] home. As the officers were speaking with [L.H.], he made the threat "that kid has a death wish, I'm gonna get him when I

1
2
3
    get back. Just watch me, I'll be here 5 minutes and I'm gonna get him". He also made a comment that he hated the police and wanted to get a gun and shoot them. [L.H.] threatened the life of the Campus Supervisor and the Principal. These comments were made in front of the authorities.

(Doc. 15-9 at 58). The Board of Education for the Bakersfield City School District voted to expel Plaintiff on January 27, 2009. (Doc. 15-9 at 76-77). The district referred Plaintiff to a community school, and set forth a "rehabilitation plan" for Plaintiff. *Id.*

Plaintiff failed to comply with the terms of the rehabilitation play, and was assigned to begin the sixth grade at Rafer Johnson Community Day School. (Doc. 15-9 at 12). On October 1, 2009, Plaintiff refused to complete an assignment, left class without permission, was "constantly talking, and not on task." (Doc. 15-8 at 30). The next day his teacher noted Plaintiff "was yelling loudly, using extreme profanity, including the 'F' word." *Id.* Similar behavior over the next several days resulted in a five-day suspension beginning October 8, 2009. *Id.* After walking out of class without permission, mocking a substitute teacher, and being "very disrespectful . . . on a daily basis," he was suspended for five more days beginning October 18, 2009. *Id.* at 28.

After transferring to Emerson Middle School, Plaintiff continued defiant behavior, including "shouting profanities at teacher, students, and staff repeatedly." (Doc. 15-8 at 28). He was "exhibiting menacing behaviors in the presence of teacher and students," and left the campus without permission on more than one occasion. *Id.* at 27-28. On September 21, 2010, Plaintiff was disciplined when he told a teacher, "Fuck yourself nigger, Im [sic] a crip." (Doc. 15-8 at 25). In addition, Plaintiff was suspended for five days following an incident on October 6, 2010. *Id.* A substitute teacher attempted to restrain Plaintiff from attacking another student, and the teacher reported Plaintiff "pushed him in the chest and use profanity towards him." *Id.* An academic coach witnessed Plaintiff "use profanity towards the teacher and turn[] around and push[] him in the chest again." *Id.*

On November 23, 2010, the Bakersfield City School District expelled Plaintiff once again, and assigned him to Kern County Superintendent of Schools' Community School. (Doc. 15-10 at 62-64).

**B.  Relevant Medical Opinions**

Dr. Thomas Middleton saw Plaintiff when he was nearly 11 years old for a psychological evaluation on December 16, 2008. (Doc. 15-12 at 21). Dr. Middleton observed Plaintiff "was quiet

and cooperative in manner." *Id.* at 22.  In addition, Dr. Middleton found:  "He was alert and his mood was normal.  His affect was appropriate.  He was oriented for person, place, and time. . . The minor's attention and concentration were adequate." *Id.* at 23.  Dr. Middleton Plaintiff was hospitalized at the end of 2007 after he "placed a plastic bag over his head and stated that he wanted to die so he could be with his deceased father." *Id.* at 22.  Plaintiff told Dr. Middleton he was "really mad" when he attempted suicide "and acknowledged that he did not really mean to kill himself." *Id.* at 23.  Also, Plaintiff told Dr. Middleton that he heard voices and could "see 'white things' as well as his father." *Id.*  Dr. Middleton concluded Plaintiff's "level of intellectual functioning falls in the low [a]verage range," and recommended "individual counseling for his depression, anger management problems, etc." *Id.* at 26.

On December 22, 2008, Dr. Vea completed a childhood disability evaluation form.  (Doc. 15-12 at 29-34).  Dr. Vea opined Plaintiff's impairments were severe, but did not meet or medically equal, or functionally equal the listings. *Id.* at 29.  According to Dr. Vea, Plaintiff had "no limitation" in acquiring and using information because he had fair judgment, average intelligence, and was not in special education classes. *Id.* at 31.  Dr. Vea opined Plaintiff had "no limitation" moving about and manipulating objects, caring for himself, and with health and physical well-being. *Id.*  Further, Dr. Vea found Plaintiff had "less than marked" limitation in attending and completing tasks, though he was "[e]asily distracted" and did not listen. *Id.*  Based upon Plaintiff's school records and the report of his mother, Dr. Vea opined Plaintiff had "less than marked" limitation with interacting and relating with others. *Id.*

Dr. Trachtenberg completed a childhood disability form on May 6, 2009, and indicated Plaintiff had severe mental impairments.  (Doc. 15-12 at 45-50).  Dr. Trachtenberg opined Plaintiff had a "less than marked" limitation in acquiring and using information, based upon his IQ and WRAT-4 test results, and "[h]is speech was reported to be well formed and direct." *Id.* at 47.  Further, he observed a psychiatric progress note from December 30, 2008 "reported average intelligence." *Id.*  This same noted "indicated that attention/concentration were intact." *Id.*  Likewise, Dr. Middleton "indicated that his attention and concentration were adequate." *Id.*  Based upon these assessments, Dr. Trachtenberg opined Plaintiff had a "less than marked" limitation in attending and completing tasks.

1 Due to Plaintiff's "history of being expelled from two elementary schools for fighting, acting up,
2 saying things, [and] . . . threaten[ing] to hurt his family," Dr. Trachtenberg concluded Plaintiff had a
3 "marked" limitation in interacting and relating with others. *Id.* Dr. Trachtenberg found Plaintiff had
4 "no problems" with moving about and manipulating objects. *Id.* at 48. Dr. Trachtenberg opined the
5 allegations of disability "exceed objective material." *Id.* at 50.

**C.  Hearing Testimony**

Plaintiff testified at a hearing before the ALJ on January 25, 2011. (Doc. 15-3 at 25). He reported he was thirteen years old and he lived in a house with his mom, four sisters, and two brothers. *Id.* He said he was responsible for cleaning his room, and "[s]ometimes" made decisions about what clothes to wear to school. *Id.* at 30-31.

He stated that he was in the seventh grade, and he went to a community school after being expelled from Emerson Junior High School. (Doc. 15-3 at 30, 32, 36). According to Plaintiff, he was expelled for fighting with a teacher:

Q: [W]hat happened?

A: I was thirsty that day and I wanted to some water and [the teacher] told me to sit down and I said no, I'm going to get me some water. And he grabbed me by the neck and threw me against the wall.

Q: And what did you do?

A: I pushed him off of me, I kept pushing him until he grabbed me so hard around my neck I tried to hit him.

(Doc. 15-3 at 37). Also, Plaintiff said he threw a chair at a teacher at the school he attended before Emerson. *Id.*

Plaintiff explained he went to school one day a week where his teacher gave him homework for the rest of the week. *Id.* at 32. Plaintiff reported he did "probably all" of his homework, and thought he was doing okay in school. *Id.* at 33. He did not believe he had any difficulties reading. *Id.* at 34. Plaintiff said that when in school he "[k]ind of, not really" had problems staying in his seat. *Id.*

Plaintiff said he had a friend who moved out of town, and did not do anything with his siblings because they would "fight all the time." (Doc. 15-3 at 31, 40). He testified he did not get along well with classmates when he was in a regular classroom because he did not like some of them, and some

of them did not like him. *Id.* at 34-35. He reported that he spent his time at home watching cartoons on television, and he did not really like sports. *Id.* at 31-32.

Plaintiff reported he went to a counselor "every couple of weeks." (Doc. 15-3 at 36). He stated people did not like him, so he did not like them in return. *Id.* at 38. In addition, Plaintiff said he heard voices "[e]very day" that would "just whisper but sometimes they talk to [him]." *Id.* at 38-39.

Felisha Owens, Plaintiff's mother, testified after him at the hearing. (Doc. 15-3 at 41). She reported that she first noticed Plaintiff's behavior problems "when he was five-years-old, after his father died. *Id.* at 42. Ms. Owens explained Plaintiff had "angry problems" and began "acting up at school." *Id.* According to Ms. Owens, Plaintiff first attended Roosevelt Elementary School, from which he was expelled for "[b]eing defiant," having problems with classmates, and "cursing at the teacher." *Id.* at 42-43. She stated Plaintiff next attended McKinley "[f]or a couple of years," until he was expelled from the school for "[f]ighting and arguing with the teacher." *Id.* at 43. Ms. Owens stated Plaintiff's third and fourth schools were Sequoia and Emerson, which also expelled him. *Id.* at 43-44. Ms. Owens reported Plaintiff did his homework for the community school "when he want[ed] to do it," but he would "get distracted." *Id.* at 44-45.

She testified Plaintiff took Seroquel and Wellbutrin, which were prescribed by a doctor at Clinica Sierra Vista. (Doc. 15-3 at 45). She estimated Plaintiff had been taking the medication for "a couple of years," and that the medication helped. *Id.* She explained the medication calmed Plaintiff, and without that medication he goes off the handle." *Id.* However, Ms. Owens believed Plaintiff still had problems while taking his medication. *Id.*

According to Ms. Owens, Plaintiff had to be taken into custody after he threatened to kill someone, and was hospitalized for "depression and hearing voices." (Doc. 15-3 at 45-46). She said she would catch Plaintiff talking to himself, and that Plaintiff reported talking to his dead father. *Id.* at 46. She reported Plaintiff was on probation, and his probation officer visited their house "about once a month, twice a month." *Id.* at 47.

**D.    The ALJ's Findings**

Pursuant to the three-step process, the ALJ found Plaintiff had not engaged in substantial gainful activity since the application date of October 31, 2008. (Doc. 15-3 at 12). Next, the ALJ

8

determined Plaintiff had the following severe impairment: "attention deficit hyperactivity disorder, oppositional defiant disorder, and mood disorder." *Id.*

To determine whether Plaintiff's impairments satisfied the listings, the ALJ examined the six functional domains set forth in 20 C.F.R. § 416.926a. The ALJ determined Plaintiff had "less than marked limitation in acquiring and using information." (Doc. 15-3 at 15). In addition, he had "less than marked limitation in attending and completing tasks." *Id.* at 16. Plaintiff had "marked limitation in interacting and relating with others." *Id.* at 17. The ALJ found Plaintiff had "no limitation" in moving about and manipulating objects, in the ability to care for himself, and in health and physical well-being. *Id.* at 18-19. Because Plaintiff did not have an impairment that resulted in "marked" limitations in two domains or "extreme" limitation in one domain, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.* at 19.

## DISCUSSION AND ANALYSIS

Plaintiff argues the ALJ erred in her evaluation of the third domain of interacting and relating with others. (Doc. 16 at 3-13). To evaluate a minor's ability to interact and relate with others, the ALJ is instructed to "consider how well [the child] initiate[s] and sustain[s] emotional connections with others." 20 C.F.R. 416.926a(i). In addition, the ALJ considers the ability to "develop and use the language of [the] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." *Id.*

Here the ALJ determined Plaintiff had a "marked limitation in interacting and relating with others." (Doc. 15-3 at 17). In the so finding, the ALJ observed:

> The claimant's mother, Felisha Owens, reported in November 2008 that the claimant did not have any problems communicating (Exhibit 3E, p. 4), did not have friends his own age, make new friends, generally get along with other adults or school teachers, or play team sports (Exhibit 3E, p. 7).
>
> The claimant had great leadership ability, was intelligent, very independent, and had strong communication skills, and was very articulate. However, he argued with adults when given directions or instructions and refused to comply with requests. He engaged in disruptive behavior and physical aggression daily when at school, severe enough to warrant referrals and suspensions (Exhibit 14E). He showed that he could follow the rules when he chose (Exhibit 14[E], p. 251).
>
> The [plaintiff] has been charged with assault with a deadly weapon and making terrorist threats (Exhibit 2F). He has also thrown a chair at his probation officer and

> been involved in many fights. His activities have led to multiple suspensions and expulsions from school (Exhibit 1E, p. 20).

(Doc. 15-3 at 17). Plaintiff argues these findings lack the support of substantial evidence. (Doc. 16 at 3). Further, Plaintiff asserts "Exhibit 14E," which contains the school records from Bakersfield City School District, belies a finding that Plaintiff could follow the rules. *Id.* at 10- 13. Plaintiff asserts "all the suspensions and expulsions and supporting particulars," demonstrate he "is unable to cooperate with others and comply with rules." *Id.* at 13-14.

Defendant argues, "The ALJ's finding that Plaintiff had a 'marked' limitation in interacting and relating with others was supported by substantial evidence in the record." (Doc. 17 at 10). Defendant contends the opinion of the ALJ was "consistent with the opinion of child psychiatrist, Dr. Trachtenberg, who . . . concluded that Plaintiff's only 'marked' limitation was in the domain of interacting and relating with others." *Id.* Further, Defendant notes that the opinion of the ALJ was "more restrictive" than the opinions of other physicians. *Id.*

Significantly, in a Social Security Ruling, the Commissioner explained the term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion *need not* prove by a preponderance that the opinion is wrong." 1996 SSR 4 LEXIS 9 at *8.[1] Rather, "[i]t need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.* The opinion of an examining physician may be substantial evidence in support of the ALJ's decision. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Likewise, an ALJ may use evidence from educational personnel, including "school teachers, counselors, [and] early intervention team members." 20 C.F.R. § 416.913(d)(2). Thus, statements from these sources may be substantial evidence in support of an ALJ's findings.

Here, the ALJ referred to school records to evaluate Plaintiff's ability to interact and relate with others. (Doc. 15-3 at 17, citing Exhibit 14E). Although Plaintiff contends the ALJ failed to cite

---

[1] Social Security Rulings are issued by the Commissioner to clarify regulations and policies. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

evidence supporting the findings that Plaintiff is "very independent," "has strong communication skills," and "is articulate" (Doc. 16 at 9), these statements were made by school personnel in the exhibit cited by the ALJ. On September 12, 2008, a team from McKinley Elementary—including the vice principal, nurse, and counselor—opined "[L.H.] has demonstrated leadership skills [and] he is articulate." (Doc. 15-9 at 18). On October 15, 3008, the school team noted: "[L.H.] has great leadership abilities, is intelligent, very independent. . . [L.H.] is very articulate and has strong communication skills." *Id.* at 85. The team believed Plaintiff "has shown that he can follow the rules when he chooses." *Id.* Accordingly, these statements are substantial evidence supporting the findings of the ALJ.

Moreover, the assessment of Dr. Trachtenberg supports the ALJ's conclusion. After reviewing the record, Dr. Trachtenberg noted Plaintiff had "history of being expelled from two elementary schools for fighting, acting up, saying things, [and] . . . threaten[ing] to hurt his family." (Doc. 15-12 at 47). Based upon this, Dr. Trachtenberg opined Plaintiff had a "marked" limitation interacting and relating with others. *Id.* Accordingly, the assessment of Dr. Trachtenberg, an examining physician, is substantial evidence supporting the ALJ's findings.

## **CONCLUSION AND ORDER**

Although Plaintiff argues the evidence supports a finding that he has an extreme, rather than marked, limitation, the decision of the ALJ is supported by substantial evidence in the record. It is not the role of the Court to reweigh the evidence. See *German v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 25691, at *11-12 (E.D. Cal. Mar. 14, 2011). Rather, "[w]here the evidence is susceptible to more than one rational interpretation, one of which the ALJ"s decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

Here, the findings of the ALJ regarding the third domain are supported by substantial evidence, including the school records and assessment of Dr. Trachtenberg. Therefore, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court, because the ALJ applied the proper legal standards and her findings are supported by substantial evidence. *See Sanchez*, 812 F.2d at 510.

///

///

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff L.H., Jr.

IT IS SO ORDERED.

Dated: **January 4, 2013**          **/s/ Jennifer L. Thurston**
                                    UNITED STATES MAGISTRATE JUDGE